UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE HOUSING AUTHORITY OF THE ) <br> CITY OF PICHER, OKLAHOMA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA, *ex rel.* ) <br> Secretary, Department of Housing and Urban ) <br> Development; and BOARD OF COUNTY ) <br> COMMISSIONERS OF THE COUNTY OF ) <br> OTTAWA, OKLAHOMA, ) <br> ) <br> Defendants. ) | Case No. 14-CV-0322-CVE-PJC |

## OPINION AND ORDER

Before the Court is the motion for summary judgment (Dkt. # 20) filed by defendant United States of America. Plaintiff, the Housing Authority of the City of Picher (PHA), initiated this interpleader action to determine the ownership of the funds remaining in its possession, to which both defendants had made written demand. Dkt. # 2, at 6. The United States, acting on behalf of the Secretary of the Department of Housing and Urban Development (HUD), argues that summary judgment pursuant to Fed. R. Civ. P. 56 should be granted in its favor based on the language of the contract between HUD and the PHA. Dkt. # 20, at 6-10. Defendant the Board of County Commissioners of the County of Ottawa, Oklahoma (the County) responds that summary judgment is improper because the relevant contract is ambiguous, because HUD has waived any claim to the interpled funds, and because the County has an equitable claim to at least a portion of the funds. Dkt. # 39, at 6-11. The United States has filed a reply. Dkt. # 40. With the Court's permission, the County has filed a sur-reply. Dkt. # 43.

**I.**

The PHA is "a public body corporate and politic, duly organized and existing under the laws of the State of Oklahoma." Dkt. # 2, at 4. In 1965, HUD and the PHA entered into an Annual Contributions Contract to develop and operate low rent housing in the City of Picher, Oklahoma (Picher). Id. at 5. The PHA successfully operated the housing project until two major events led to the closure of the project and the dissolution of Picher itself.[1] Id. In 1983, a large area in northeastern Oklahoma, including Picher, was designated as the Tar Creek Superfund site, a result of the extensive lead and zinc mining operations that had taken place in the area. B.H. v. Gold Fields Mining Corp., 506 F. Supp. 2d 792, 796 (N.D. Okla. 2007). In 2004, the state of Oklahoma began to relocate the citizens of Picher, both because living in the town had become a major health hazard and because many buildings were in danger of collapsing unexpectedly. Cole v. ASARCO Inc., 256 F.R.D. 690, 693-94 (N.D. Okla. 2009). And in May 2008, an F4 tornado struck Picher and destroyed a large portion of the city, including much of the housing project operated by the PHA. Dkt. # 20, at 3. As a result of these events, the housing project became uninhabitable. Id. Picher ceased all municipal operations in 2009, Dkt. # 25, at 2, and involuntary dissolution proceedings began in 2010. Wyant v. Dissolution of Picher, CV-2010-00007 (Dist. Ct. Ottawa Cnty. 2010).

---

[1] Although these events are important to the development of this action, neither party included facts discussing them in any filing related to the motion for summary judgment. However, the Court can take judicial notice of "those matters that are verifiable with certainty." St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979). This includes the Court's own records, as well as records of related state court cases. Id. The Court hereby takes judicial notice of past cases that address the history of Picher.

The relationship between HUD and the PHA was governed by the Consolidated Annual Contributions Contract (CACC), which the entities signed in 1996. Dkt. # 39-5, at 7[2]; see also Dkt. ## 20-3, 20-4. The CACC by its terms superseded all preceding agreements between HUD and the PHA. Dkt. # 20-3, at 4. The CACC contains a number of relevant provisions:

- Operating receipts shall mean all rents, revenues, income, and receipts accruing from, out of, or in connection with the ownership or operation of such project. . . . Operating expenditures shall mean all costs incurred by the [PHA] for administration, maintenance and other costs and charges that are necessary for the operation of the project. Dkt. # 20-3, at 5.

- The [PHA] shall deposit and invest all funds and investment securities received by or held for the account of the [PHA] in connection with the development, operation and improvement of the projects . . . in accordance with the terms of the General Depository Agreement(s). Id. at 7.

- All monies and investment securities received by or held for the account of the [PHA] in connection with the development, operation and improvement of the projects . . . shall constitute the "General Fund." Id.

---

[2] Local Rule 56.1(c) states that a response brief "shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist." LCvR 56.1(c). In its response brief, the County, rather than identifying genuine issues of fact, chose to "dispute" the United States's statements of undisputed facts, see Dkt. # 39, at 2-6, by asserting that certain facts were immaterial or that a contract should be interpreted in a specific manner. These are legal arguments, not disputes of fact. E.g. id. at 3, 5.

- The [PHA] may deposit into an account covered by the terms of the General Depository Agreement any funds received or held by the [PHA] in connection with any project operated by the [PHA] under the provisions of [the CACC]. Id.

- The [PHA] may also deposit into an account covered by the terms of the General Depository Agreement, by lump sum transfers of funds from the depositories of other projects or enterprises of the [PHA] in which HUD has no financial interest, amounts necessary for current expenditures of items chargeable to all projects and enterprises of the [PHA]. Id.

- [T]he [PHA] shall procure adequate insurance to protect the [PHA] from financial loss resulting from various hazards if the [PHA] determines that exposure to certain hazards exists. Id. at 9.

- The [PHA] shall, to the extent that insurance proceeds permit, promptly restore, reconstruct, and/or repair any damaged or destroyed property of a project, except with the written approval of HUD to the contrary. Id. at 9-10.

- If any project under management under this ACC is terminated, all project reserves shall become part of another project administered by the [PHA] in accordance with the terms of [the CACC]. If no other project(s) under management exists, the remaining project reserves shall be distributed as directed by HUD. Id. at 10.

In accordance with the CACC, the PHA used as its primary operating account a bank account subject to a General Depository Agreement (GDA). Dkt. # 20, at 4. The GDA was a standard

contract, and HUD required each account in use by the PHA to be subject to the GDA. Dkt. # 39-5, at 23. The following provisions are present in each GDA submitted to the Court[3]:

- If the Depository received written notice from HUD that no withdrawals by the [PHA] from the Accounts are to be permitted, the Depository shall not honor any check or other order to pay from the Accounts or directive to purchase or sell securities, or permit any withdrawals by the [PHA] from said accounts until the Depository is authorized to do so by written notice from HUD. Dkt. # 20-5, at 1.

- HUD is intended to be a third party beneficiary of this Agreement and may sue to enforce its provisions and to recover damages for failure to carry out its terms. Id. at 2.

- The provisions of this Agreement may not be modified by either Party without the prior written approval of HUD. Id.

The PHA had purchased or renewed property insurance every year, as required by the CACC. Dkt. # 39-5, at 20. The policy listed the PHA as the insured, and it did not show HUD as either an additional insured or loss payee. Dkt. # 39-5, at 22. Much of the housing project operated

---

[3] The United States submitted two different GDAs, one with its motion for summary judgment and one with its reply. Dkt. # 20-5; Dkt. # 40, at 13-14. In its sur-reply, the County argues that the Court should not consider the second GDA because it was submitted as part of the United States's reply brief. Dkt. # 43, at 1. In general, Rule 56(c) requires giving the non-movant the opportunity to respond to new evidence or argument submitted in a reply brief, unless the new evidence or argument plays no role in the court's decision. Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-64 (10th Cir. 1998). Because the Court allowed the County to file a sur-reply, it will not be prejudiced by the Court's consideration of the evidence submitted with the United States's reply brief. Cf. Green v. New Mexico, 420 F.3d 1189, 1196 (10th Cir. 2005) ("Generally, the nonmoving party should be given an opportunity to respond to new material raised for the first time in the movant's reply."). Moreover, the second GDA is identical in all respects except the names of the bank and the signatories to the first GDA that the United States submitted. Compare Dkt. # 20-5, with Dkt. # 40, at 13.

by the PHA was destroyed by the tornado in 2008. See Dkt. # 2, at 5; Dkt. # 10, at 1. After the tornado, the PHA received approximately $1.7 million in insurance proceeds. Dkt. # 39-7. The funds were deposited into the PHA's bank account. Dkt. # 39-5, at 23. According to the PHA's long-time accountant, the PHA deposited all sources of income, including HUD subsidies, rent from tenants, and all other income, into its account. Dkt. # 39-6.

Following the tornado, the PHA requested permission to relocate to the nearby city of Fairland, Oklahoma and begin a new housing project, but HUD chose to discontinue the project entirely. Dkt. # 39-5, at 30. Following HUD's decision, the PHA began the process of winding up its affairs. A small portion of the land that had been part of the housing project was transferred to the County, while the bulk was transferred to the Quapaw Tribe of Indians. Dkt. # 20, at 3. As of January 31, 2014, all of the PHA's remaining units in Picher were vacated. Dkt. # 2, at 5. At that time, approximately $1.2 million remained in the PHA's bank account, at least a part of which was the remainder of the insurance proceeds. Dkt. # 20, at 4. The United States demanded return of the HUD funds remaining in the PHA's account. Dkt. # 2, at 6. The County also made written demand of the PHA for the funds. Id. In response, the PHA filed an interpleader action in Oklahoma state court, requesting a judicial determination of who should receive the funds. Id. The PHA made no claim to the funds. Id. The United States removed to this Court, id. at 1, and it now moves for summary judgment. Dkt. # 20. During the period in which the motion for summary judgment was pending, the PHA was dismissed from the case on the ground that it had no interest in the interpled funds. Dkt. ## 21, 22.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

The United States and the County each argue their entitlement to the funds at issue. However, before this Court can address the merits of the parties' competing claims, the Court must ensure that it may, in fact, decide the case. Although the issue was not briefed--or even mentioned--by the parties, this Court has a duty to determine if it has subject matter jurisdiction. 1mage Software, Inc. v. Reynolds & Reynolds Co., 459 F.3d 1044, 1048 (10th Cir. 2006) ("Federal courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party,' and thus a court may *sua sponte* raise the question of whether there is subject matter jurisdiction 'at any stage in the litigation.'" (quoting Arbaugh v. Y & H Corp. 546 U.S. 500, 501 (2006))); see also FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). If jurisdiction is not proper, the Court cannot decide this case. See Johnson v. Wattenbarger, 361 F.3d 991, 993 (7th Cir. 2004) ("[C]ourts cannot decide any controversy over which they lack subject-matter jurisdiction.").

The Tucker Act, 28 U.S.C. § 1491(a)(1), and the Little Tucker Act, 28 U.S.C. § 1346(a)(2), govern the jurisdiction of certain civil actions against the United States. See United States v. Bormes, 133 S. Ct. 12, 16-17 (2012); Whiskers v. United States, 600 F.2d 1332, 1334 (10th Cir. 1979) ("[T]hrough the Tucker Act the United States has consented to be sued in the district courts and the Court of Claims for money damages arising out of certain specified circumstances."). The Tucker Act states that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract

with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Little Tucker Act gives federal district courts concurrent jurisdiction over cases governed by the Tucker Act that are "not exceeding $10,000 in amount." Id. § 1346(a)(2). "Exclusive jurisdiction therefore rests in the Claims Court if three conditions are satisfied: (1) the action is against the United States; (2) the action seeks monetary relief in excess of $10,000; and (3) the action is founded upon the Constitution, federal statute, executive regulation, or government contract." Rogers v. Ink, 766 F.2d 430, 433 (10th Cir. 1985) (citing Portsmouth Redev. & Hous. Auth. v. Pierce, 706 F.2d 471, 473 (4th Cir. 1983)).

All three of the conditions described in Rogers are present here. An action is "against" the United States "where the relief sought would 'expend itself on the public treasury or domain, or interfere with the public administration.'" Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 715 (1949) (quoting Land v. Dollar, 330 U.S. 731, 738 (1947)); see also Rogers, 766 F.2d at 435. The parties seek a judicial determination of their competing claims to the approximately $1.2 million remaining in the PHA's account. Dkt. # 20, at 4; Dkt. # 39, at 6. Thus, determining whether this action is truly "against" the United States--as opposed to simply including the United States as a party[4]--requires determining whether the interpled funds are connected to monies born of "the public treasury or domain." If so, then awarding the funds to one of the parties would necessarily "expend itself on the public treasury or domain."

---

[4] The procedural posture of this interpleader action is unlike the common run of cases before the Court of Federal Claims. However, the Tenth Circuit has noted that "[a] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." Rogers, 766 F.2d at 434 (collecting cases); see also Hoopa Valley Tribe v. United States, 596 F.2d 435, 436 (Fed. Cl. 1979).

9

Neither party provides records identifying whether the interpled funds include any money given directly by the United States, such as through subsidies or grants. See Dkt. # 20-2, at 2 (noting that the PHA received funds from HUD in the past); cf. 42 U.S.C. § 1437f (giving HUD the power to enter into contracts with public housing agencies to make assistance payments to low-income families); Dkt. # 20-3, at 5 (stating that "HUD shall provide annual contributions to the HA in accordance with all applicable statutes"). However, the parties' arguments make apparent that some or all of the interpled funds are the balance of the insurance proceeds paid to the PHA after the 2008 tornado. See Dkt. # 39, at 9; Dkt. # 40, at 2. Thus, if the insurance proceeds are equivalent to funds originating in the public treasury, such as HUD subsidies or grants, the first Rogers condition is met.

The County argues that the insurance proceeds are, or at least could be, separate funds belonging solely to the PHA. The County's argument may be summarized as follows. The CACC allows the PHA to keep HUD subsidies and receipts as well as monies unrelated to HUD's support of the housing project in the same account. Dkt. # 39, at 6; see also Dkt. # 20-3, at 7. The PHA arguably had separate funds in its account, funds it accrued through its daycare center, repair and cleaning fees, and other miscellaneous sources. Dkt. # 39-6, at 1, 5. The CACC required the PHA to purchase insurance. Dkt. # 20-3, at 9. The PHA purchased--or, at least, could have purchased--insurance using these separate funds. Dkt. # 39, at 7. The insurance proceeds were deposited into the account that included both HUD monies and separate funds, but because the insurance could have been purchased with separate funds, the proceeds could be separate as well.[5] Id.

---

[5] The County makes much of the fact that, when deposed, HUD's representative stated that he did not know whether non-HUD funds placed in the account retained their independence, in contrast to earlier HUD arguments that all funds in the account were HUD funds by default. Dkt. # 39, at 6. However, the status of the funds is a legal issue for a court to decide.

Under Oklahoma law,[6] "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." 15 OKLA. STAT. tit. 15 § 154. "A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context." Lewis v. Sac & Fox Tribe of Okla. Housing Auth., 896 P.2d 503, 514 (Okla. 1994). "The terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intention of the parties as it existed at the time the contract was negotiated." Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991); see also OKLA. STAT. tit. 15 § 160. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ." OKLA. STAT. tit. 15, § 155.

---

[6] The United States removed to this Court pursuant to 28 U.S.C. § 1442(a)(1). Dkt. # 2, at 2. In such cases, federal district courts apply the substantive law of the state from whose courts the case was removed. Arizona v. Manypenny, 451 U.S. 232, 242-43 (1981); City of Aurora ex rel. People of State of Colo. v. Erwin, 706 F.2d 295, 297 (10th Cir. 1983) ("[A] federal court exercising jurisdiction under section 1442(a)(1) serves as an alternative forum in a manner roughly analogous to its role in diversity cases, applying state law through the mechanism of its own procedural rules.").

Although the CACC is not well-drafted,[7] its provisions suffice to determine the jurisdictional question at hand.[8] The CACC defines "operating receipts" as "all rents, revenues, income, and receipts accruing from, out of, or in connection with the ownership or operation of" a housing project, and it defines "operating expenditures" as "all costs incurred by the HA for administration, maintenance and other costs and charges that are necessary for the operation of the project." Dkt. # 20-3, at 5. The CACC requires the PHA to "procure adequate insurance to protect the [PHA] from financial loss" and mandates that insurance proceeds be used to "promptly restore, reconstruct, and/or repair any damaged or destroyed property of a project." Id. at 9. The CACC states that the PHA must deposit all funds "received by or held for the account of the [P]HA in connection with the development, operation and improvement of the projects under [the CACC]" into the General Fund. Id. at 7. However, it gives the PHA the right to deposit into an account covered by the General Depository Agreement "funds from . . . enterprises of the [P]HA in which HUD has no financial interest." Id.

Interpreting these provisions, it appears that any insurance proceeds would necessarily be connected to funds that HUD provided to the PHA. The County's argument depends on the

---

[7] For example, one provision of the CACC states that "[i]f any project under management . . . is terminated, all project reserves shall become part of another project . . . . If no other project . . . exists, the remaining project reserves shall be distributed as directed by HUD." Dkt. # 20-3, at 10 (emphasis added). The CACC does not define "project reserves," nor does the phrase appear elsewhere in the contract. The United States equates "project reserves" with the PHA's General Fund. Dkt. # 20, at 9. However, a federal regulation identifies "project reserve" as a reserve account separate from the budget account otherwise in use by a housing authority. 24 C.F.R. § 982.154. Thus, the interpretation of the term "project reserves" is unclear where, as here, the housing authority had only one account.

[8] The Court addresses the provisions of the CACC and other related evidence solely for the purpose of determining subject matter jurisdiction. This analysis is in no way binding on the Court of Federal Claims in addressing the merits of the case.

12

determination that the PHA had "funds from . . . enterprises . . . in which HUD has no financial interest." However, no such alternate enterprise has been identified; the only apparent project operated by the PHA was the housing project, and HUD had a financial interest in that project. See Dkt. # 2, at 5; see also Dkt. # 39-5, at 7 (noting that the PHA operated multiple complexes but was, from HUD's perspective, only one project). The County supports its argument with citation to the affidavit of the PHA's long-time accountant, as well as a spreadsheet detailing the PHA's "other income" for the 2008-2011 fiscal years created by that accountant. Dkt. # 39, at 5. However, all of these sources of "other income"--which includes tenant-related income like late charges and repair fees, rental income from the PHA's community building and daycare center, and sales by the PHA of various products, Dkt. # 39-6, at 5--were "operating receipts" under the CACC, as all were "income . . . accruing from, out of, or in connection with" the operation of the housing project.[9] As such, all of this income was part and parcel of the PHA's only apparent project. Thus, it does not seem as though the PHA possessed any separate funds that could have been used to purchase the insurance.

Moreover, the provisions of the GDA and related federal regulations imply that the funds in the account originated in the public fisc. The GDA states that HUD is "intended to be a third party beneficiary." Dkt. # 20-5, at 2. It also gives HUD the power to prevent the bank from honoring any order to pay without its permission, and it allows HUD ultimate control over whether its provisions

---

[9]  The PHA's executive director specifically stated that "all monies received by the PHA in connection with the operation and improvement of The Housing Project were deposited into a General Fund in a bank account governed by a General Depository Agreement." Dkt. # 20-2, at 2. This matches the CACC's requirement that such funds, which would include operating receipts, be deposited in an account governed by a general depository agreement. Dkt. # 20-3, at 7.

can be modified. Id. at 1, 2. Furthermore, one of the federal regulations governing banks that have entered into GDAs with housing authorities states that, when HUD has provided the bank with written notice not to allow further withdrawals by a housing authority, "[t]he depositary must permit withdrawals of . . . funds by HUD."[10] 24 C.F.R. § 982.156(d)(1)(ii). These provisions, which give HUD some authority over an account otherwise controlled by the PHA, imply that the parties to the GDA believed that the account would hold public funds. See OKLA. STAT. tit. 15, § 152 ("A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful."); see also id. at § 155 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .").

As there is no evidence of separate funds and HUD had some control over the depository account, it appears that the funds used to purchase the insurance likely originated with HUD. This result is unsurprising, as the CACC obligates the PHA to purchase insurance. Dkt. # 20-3, at 9. Because the funds used to purchase the insurance seem to be connected to HUD, the proceeds of the insurance policy would likewise be considered as connected to HUD. Again, this is unsurprising, as the CACC requires the PHA to use the insurance proceeds exclusively to repair the project, unless HUD gives written approval otherwise. Id. at 9-10. Because the parties agree that some, if not all, of the funds interpled in this case include the balance of the insurance proceeds, the interpled funds are connected to funds born of the public treasury. Thus, awarding the interpled funds to either party would likely require "the relief sought . . . [to] 'expend itself on the public treasury or domain, or

---

[10] Although many of the other provisions in this regulation were explicitly included in the GDAs signed by the PHA, this provision is absent.

interfere with the public administration.'" Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 715 (1949). The first Rogers condition is satisfied.

The second Rogers condition, that the amount in controversy exceed $10,000, is clearly met here. Rogers, 766 F.2d at 433. The parties do not dispute that the interpled funds total approximately $1.2 million, far in excess of the $10,000 threshold. Dkt. # 20, at 4; Dkt. # 39, at 6.

The third and final Rogers condition, that the "action is founded upon . . . [a] government contract," is also met. Rogers, 766 F.2d at 433. The Court of Federal Claims has stated that the phrase "government contract" includes "not only the 'principal class of contract' involving the procurement of goods, lands, and services, but any other agreement undertaken by the Federal government that has a private analogue, that is, categorically of the sort that can be executed among private entities and individuals." Stovall v. United States, 71 Fed. Cl. 696, 699 (2006) (citing Houston v. United States, 60 Fed. Cl. 507, 511 (2004)). The parties agree that the CACC governs the relationship of the PHA and HUD. Dkt. # 20, at 2; Dkt. # 39, at 2. The CACC, although not necessarily a contract "involving the procurement of goods, lands, and services," is nevertheless a government contract because it is "the sort that can be executed among private entities and individuals." The United States's position is based entirely on the interpretation of provisions in the CACC. See Dkt. # 20, at 6-8, 9-10. The determination of whether the United States or the County is the rightful owner of the interpled funds thus necessarily depends on the interpretation of the CACC, a government contract. This satisfies the third Rogers condition, and exclusive jurisdiction over this case rests in the Court of Federal Claims.

**IV.**

As the Court lacks subject matter jurisdiction over this case, the Court cannot reach the merits of the parties arguments. Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir. 2006) ("[T]he court, having determined that it lacks jurisdiction over the action, is incapable of reaching a disposition on the merits of the underlying claims. (emphasis in original)). The Court recognizes that such "[j]urisdictional defects that arise when a suit is filed in the wrong federal district may be cured by transfer under the federal transfer statute, 28 U.S.C. § 1631, which requires a court to transfer such an action if the transfer is in the interest of justice." Haugh v. Booker, 210 F.3d 1147, 1150 (10th Cir. 2000) (internal quotation marks omitted). 28 U.S.C. § 1631 states that "[w]henever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed." The three requirements for a § 1631 transfer are "that the transferor court must lack jurisdiction, the transfer must be in the interests of justice, and the transferee court must be one in which the action could have been brought at the time the claim was filed." Rodriguez v. United States, 862 F.2d 1558, 1559-60 (Fed. Cir. 1988). The district court retains discretion to transfer an action under § 1631. In re Cline, 531 F.3d 1249, 1251 (10th Cir. 2008).

The first and third requirements are met for a transfer to the Court of Federal Claims: this Court lacks jurisdiction and the Court of Federal Claims has exclusive jurisdiction. Thus, the Court must consider whether a transfer would be "in the interests of justice." The Tenth Circuit has stated that

> [f]actors considered in deciding whether a transfer is in the interest of justice include whether the claims would be time barred if filed anew in the proper forum, whether

> the claims alleged are likely to have merit, and whether the claims were filed in good faith or if, on the other hand, it was clear at the time of filing that the court lacked the requisite jurisdiction.

Id. Transfer would be in the interests of justice. At least one of the parties' claims to the interpled funds is likely to have merit. Moreover, until the Court began reviewing the United States's motion for summary judgment, it was not apparent that exclusive jurisdiction is in the Court of Federal Claims. Given the time already devoted by the parties to this case, including extended discovery, a transfer to the Court of Federal Claims is in the interests of justice.

All three of the requirements for a discretionary transfer under § 1631 are present here. The Court, finding that it lacks subject matter jurisdiction, exercises its discretion to transfer this action to the Court of Federal Claims. The Court notes, however, that the Court of Claims lacks the statutory authority to accept a transfer of the interpled funds. Compare FED. R. CIV. P. 67 (allowing a district court to accept a deposit of funds), with R. U.S. CT. FED. CL. 67 (stating that Fed. R. Civ. P. 67 is not used in the Court of Federal Claims); see also Gravatt v. United States, 100 Fed. Cl. 279, 288 (2011) ("[B]ecause the Court of Federal Claims does not accept deposits in pending or adjudicated cases, there is no possibility that the court is holding any money to which plaintiff could be entitled."). Thus, this Court will retain the interpled funds, to await the order and judgment of the Court of Federal Claims. Upon receipt of such order and judgment, this Court will disburse the interpled funds.

**IT IS THEREFORE ORDERED** that the Court Clerk is directed to **transfer** this case to the Court of Federal Claims, with the exception of the interpled funds, which the Court Clerk will retain until receipt of the order and judgment of the Court of Federal Claims.

**IT IS FURTHER ORDERED** that the non-jury trial date set for April 6, 2015 at 9:15 a.m. is hereby **stricken**.

**DATED** this 24th day of March, 2015.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE