UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE HOUSING AUTHORITY OF THE CITY OF PICHER, OKLAHOMA,[1] | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 14-CV-0322-CVE-PJC ) |
| UNITED STATES OF AMERICA, *ex rel.* Secretary, Department of Housing and Urban Development; and BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF OTTAWA, OKLAHOMA, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## OPINION AND ORDER

Now before the Court is the United States' motion for summary judgment (Dkt. # 20). Plaintiff, the Housing Authority of the City of Picher (PHA) initiated this interpleader action to determine the ownership of the funds remaining in its possession, to which both defendants had made written demand. Dkt. # 2, at 6. The United States, acting on behalf of the Secretary of the Department of Housing and Urban Development (HUD), seeks summary judgment in its favor, arguing that the language of the contract between PHA and HUD dictates that HUD receive the funds. Dkt. # 20, at 6-10. The Board of County Commissioners of the County of Ottawa, Oklahoma (the County) responds that summary judgment is inappropriate, arguing that the relevant contract is ambiguous, HUD has waived any claim to the interpled funds, and the County has an equitable

---

[1] The Court has dismissed plaintiff from this action because plaintiff has no interest in the interpled funds. Dkt. # 22. However, pursuant to this Court's practice, the Court does not alter the original caption.

claim to at least some of the funds. Dkt. # 39, at 6-11. The United States has filed a reply. Dkt. # 40. With the Court's permission, the County has filed a sur-reply. Dkt. # 43.

**I.**

The PHA is "a public body corporate and politic, duly organized and existing under the laws of the State of Oklahoma." Dkt. # 2, at 4. In 1965, HUD and the PHA entered into an Annual Contributions Contract to develop and operate low rent housing in the City of Picher, Oklahoma (Picher). Id. at 5. The PHA successfully operated the housing project until two major events led to the closure of the project and the dissolution of Picher itself.[2] Id. In 1983, a large area in northeastern Oklahoma, including Picher, was designated as the Tar Creek Superfund site, a result of the extensive lead and zinc mining operations that had taken place in the area. B.H. v. Gold Fields Mining Corp., 506 F. Supp. 2d 792, 796 (N.D. Okla. 2007). In 2004, the state of Oklahoma began to relocate the citizens of Picher, both because living in the town had become a major health hazard and because many buildings were in danger of collapsing unexpectedly. Cole v. ASARCO Inc., 256 F.R.D. 690, 693-94 (N.D. Okla. 2009). And in May 2008, an EF4 tornado struck Picher and destroyed a large portion of the city, including much of the housing project operated by the PHA. Dkt. # 20, at 3. As a result of these events, the housing project became uninhabitable. Id. Picher ceased all municipal operations in 2009, Dkt. # 25, at 2, and involuntary dissolution

---

[2]    Although these events are important to the development of this action, neither party included facts discussing them in any filing related to the motion for summary judgment. However, the Court can take judicial notice of "those matters that are verifiable with certainty." St. Louis Baptist Temple, Inc. v. Federal Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979). This includes the Court's own records, as well as records of related state court cases. Id. The Court hereby takes judicial notice of past cases that address the history of Picher.

proceedings began in 2010. Wyant v. Dissolution of Picher, CV-2010-00007 (Dist. Ct. Ottawa Cnty. 2010).

The relationship between HUD and the PHA was governed by the Consolidated Annual Contributions Contract (CACC), which the entities signed in 1996. Dkt. # 39-5, at 7[3]; see also Dkt. ## 20-3, 20-4. The CACC by its terms superseded all preceding agreements between HUD and the PHA. Dkt. # 20-3, at 4. The CACC contains a number of relevant provisions:

- Operating receipts shall mean all rents, revenues, income, and receipts accruing from, out of, or in connection with the ownership or operation of such project. . . . Operating expenditures shall mean all costs incurred by the [PHA] for administration, maintenance and other costs and charges that are necessary for the operation of the project. Dkt. # 20-3, at 5.

- The [PHA] shall deposit and invest all funds and investment securities received by or held for the account of the [PHA] in connection with the development, operation and improvement of the projects . . . in accordance with the terms of the General Depository Agreement(s). Id. at 7.

- All monies and investment securities received by or held for the account of the [PHA] in connection with the development, operation and improvement of the projects . . . shall constitute the "General Fund." Id.

---

[3]   Local Rule 56.1(c) states that a response brief "shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist." LCvR 56.1(c). In its response brief, the County, rather than identifying genuine issues of fact, chose to "dispute" the United States's statements of undisputed facts, see Dkt. # 39, at 2-6, by asserting that certain facts were immaterial or that a contract should be interpreted in a specific manner. These are legal arguments, not disputes of fact. E.g. id. at 3, 5.

- The [PHA] may deposit into an account covered by the terms of the General Depository Agreement any funds received or held by the [PHA] in connection with any project operated by the [PHA] under the provisions of [the CACC]. Id.

- The [PHA] may also deposit into an account covered by the terms of the General Depository Agreement, by lump sum transfers of funds from the depositories of other projects or enterprises of the [PHA] in which HUD has no financial interest, amounts necessary for current expenditures of items chargeable to all projects and enterprises of the [PHA]. Id.

- [T]he [PHA] shall procure adequate insurance to protect the [PHA] from financial loss resulting from various hazards if the [PHA] determines that exposure to certain hazards exists. Id. at 9.

- The [PHA] shall, to the extent that insurance proceeds permit, promptly restore, reconstruct, and/or repair any damaged or destroyed property of a project, except with the written approval of HUD to the contrary. Id. at 9-10.

- If any project under management under this ACC is terminated, all project reserves shall become part of another project administered by the [PHA] in accordance with the terms of [the CACC]. If no other project(s) under management exists, the remaining project reserves shall be distributed as directed by HUD. Id. at 10.

In accordance with the CACC, the PHA used as its primary operating account a bank account subject to a General Depository Agreement (GDA). Dkt. # 20, at 4. The GDA was a standard

contract, and HUD required each account in use by the PHA to be subject to the GDA. Dkt. # 39-5, at 23. The following provisions are present in each GDA submitted to the Court[4]:

- If the Depository received written notice from HUD that no withdrawals by the [PHA] from the Accounts are to be permitted, the Depository shall not honor any check or other order to pay from the Accounts or directive to purchase or sell securities, or permit any withdrawals by the [PHA] from said accounts until the Depository is authorized to do so by written notice from HUD. Dkt. # 20-5, at 1.

- HUD is intended to be a third party beneficiary of this Agreement and may sue to enforce its provisions and to recover damages for failure to carry out its terms. Id. at 2.

- The provisions of this Agreement may not be modified by either Party without the prior written approval of HUD. Id.

The PHA had purchased or renewed property insurance every year, as required by the CACC. Dkt. # 39-5, at 20. The policy listed the PHA as the insured, and it did not show HUD as either an additional insured or loss payee. Dkt. # 39-5, at 22. Much of the housing project operated

---

[4] The United States submitted two different GDAs, one with its motion for summary judgment and one with its reply. Dkt. # 20-5; Dkt. # 40, at 13-14. In its sur-reply, the County argues that the Court should not consider the second GDA because it was submitted as part of the United States's reply brief. Dkt. # 43, at 1. In general, Rule 56(c) requires giving the non-movant the opportunity to respond to new evidence or argument submitted in a reply brief, unless the new evidence or argument plays no role in the court's decision. Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-64 (10th Cir. 1998). Because the Court allowed the County to file a sur-reply, it will not be prejudiced by the Court's consideration of the evidence submitted with the United States's reply brief. Cf. Green v. New Mexico, 420 F.3d 1189, 1196 (10th Cir. 2005) ("Generally, the nonmoving party should be given an opportunity to respond to new material raised for the first time in the movant's reply."). Moreover, the second GDA is identical in all respects (except the names of the bank and the signatories) to the first GDA submitted. Compare Dkt. # 20-5, with Dkt. # 40, at 13.

by the PHA was destroyed by the tornado in 2008. See Dkt. # 2, at 5; Dkt. # 10, at 1. After the tornado, the PHA received approximately $1.7 million in insurance proceeds. Dkt. # 39-7. The funds were deposited into the PHA's bank account. Dkt. # 39-5, at 23. According to the PHA's long-time accountant, the PHA deposited all sources of income, including HUD subsidies, rent from tenants, and all other income, into its account. Dkt. # 39-6.

Following the tornado, the PHA requested permission to relocate to the nearby city of Fairland, Oklahoma and begin a new housing project, but HUD chose to discontinue the project entirely. Dkt. # 39-5, at 30. Following HUD's decision, the PHA began the process of winding up its affairs. A small portion of the land that had been part of the housing project was transferred to the County, while the bulk was transferred to the Quapaw Tribe of Indians. Dkt. # 20, at 3. As of January 31, 2014, all of the PHA's remaining units in Picher were vacated. Dkt. # 2, at 5. At that time, approximately $1.2 million remained in the PHA's bank account, at least a part of which was the remainder of the insurance proceeds. Dkt. # 20, at 4. The United States demanded return of the HUD funds remaining in the PHA's account. Dkt. # 2, at 6. The County also made written demand of the PHA for the funds. Id. In response, the PHA filed an interpleader action in Oklahoma state court, requesting a judicial determination of who should receive the funds. Id. The PHA made no claim to the funds. Id. The United States removed to this Court, id. at 1, and moved for summary judgment. Dkt. # 20. During the period in which the motion for summary judgment was pending, the PHA was dismissed from the case on the ground that it had no interest in the interpled funds. Dkt. ## 21, 22. This Court, in a previous opinion and order, transferred the case to the Court of Federal Claims, finding that a transfer would be in the interests of justice. Dkt. # 51. The Court of Federal Claims concluded that it lacked jurisdiction and transferred the case back to this Court for

6

further proceedings. Dkt. # 53, at 19. The Court reopened the case, and now addresses the United States' motion for summary judgment.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review,

the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

The United States argues that it is entitled to the interpled funds because the County was not a party to the contract between HUD and the PHA, nor did it have any separate agreement with HUD concerning the project; the County was not involved with the project in any manner; the County cannot claim to be a successor in interest to the project because the project no longer exists; and the interpled funds are the property of HUD pursuant to the contract, meaning the PHA has no interest in the funds to which the County could be the successor. Dkt. # 20. The County responds that the contract between HUD and the PHA is ambiguous, precluding summary judgment; that the County is a successor in interest to the now-dissolved city of Picher; that HUD waived any claim to interpled funds through its inaction; and that the County has an equitable claim for at least a portion of the interpled funds based on the contribution of valuable services it made to the project. Dkt. # 39.

### A.

The primary issue in the disputed ownership of the interpled funds stems from the contract between the PHA and HUD. The United States asserts that the County is not a party to the contract and did not have any separate agreement with HUD regarding the project. Dkt. # 20, at 6. As a stranger to the contract between the PHA and HUD, the United States asserts that the County has no claim for any of the interpled funds, specifically identifying contract language expressly prohibiting the creation of any right of enforcement in any third party and prohibiting the PHA from transferring, assigning, conveying, or otherwise encumbering the project without HUD approval.

Id. at 7. The County responds that the contract is ambiguous, precluding summary judgment. Dkt. # 39, at 6. The County asserts that the contract is ambiguous regarding whether the PHA had the ability to deposit its own funds into the account governed by the GDA, and argues that, if the PHA were able to deposit its own funds into the account, it would have a colorable claim to the interpled funds. Id. at 7. Because the County argues that it is the successor in interest to the City of Picher and thus the PHA, infra III.B, it asserts that there is a genuine dispute regarding the County's right to the interpled funds. Id. In its reply, the United States asserts that the PHA purchased the insurance policy--the proceeds of which are at issue in this action--with federal grant funds and as dictated by the terms of the contract. Dkt. # 40, at 2. Thus, the United States asserts that the insurance proceeds were never separate property of the PHA. Id. In its sur-reply, the County asserts that "this is a unique, unprecedented situation which requires a hearing on the merits[.]" Dkt. # 43, at 6.

Under the terms of the CACC between HUD and the PHA, which governed the project, the general fund was established to hold funds related to the project, including "[a]ll monies and investment securities received by or held for the account of the [PHA] in connection with the development, operation, and improvement of the projects." DKt. # 20-3, at 5, 7. The CACC defined operating receipts as "all rents, revenues, income and receipts accruing from, out of, or in connection with the ownership or operation of such project," while it defined operating expenditures as "all costs incurred by the [PHA] for administration, maintenance and other costs and charges that are necessary for the operation of the project." Id. at 5. The CACC also required the PHA to "procure adequate insurance to protect the [PHA] from financial loss resulting from various hazards," and stated that "[i]f any project under management under this ACC is terminated, all project reserves

9

shall become part of another project administered by the [PHA] in accordance with the terms of the [CACC]. If no other project(s) under management exists, the remaining project reserves shall be distributed as directed by HUD." Id. The CACC also expressly stated that "nothing in this ACC shall be construed as creating any right of any third party to enforce any provision of the ACC or to assert any claim against HUD or the [PHA]." Dkt. # 20-3, at 14.

The determination of "whether a contract is ambiguous is a question of law." Ryan v. Am. Natural Energy Corp., 557 F.3d 1152, 1157 (10th Cir. 2009). The CACC does not contain a choice-of-law provision; however, "when the federal government has an articulable interest in the outcome of a dispute, federal law governs. Thus, if diverse resolutions of a controversy would frustrate the operations of a federal program, conflict with a specific national policy, or have some direct effect on the United States or its treasury, then federal law applies." Howard v. Group Hosp. Serv., 739 F.2d 1508, 1510 (10th Cir. 1984) (citations omitted). The Court thus applies federal law. Under federal law,

> Contract interpretation begins with the plain language of the agreement. Contract terms are to be accorded their plain and ordinary meaning. The language of a contract . . . must be given the meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances. It is well settled that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflicts or surplusage of its provisions.

Grand Acadian, Inc. v. United States, 97 Fed. Cl. 483, 489 (2011) (alteration in original) (internal citations and quotations marks omitted).

The County asserts that testimony from HUD officials supports its view that the contract is ambiguous. But the Court need not consider this testimony because, after reviewing the contract itself, the Court determines that the language is clear and unambiguous; thus the Court need not

consider any parol evidence to assist in making this determination. See Harris v. Allstate Ins. Co., 300 F.3d 1183, 1194 (10th Cir. 2002) (explaining that where the terms of a contract are unambiguous, they should be construed without considering extrinsic evidence).[5] The CACC clearly provides for the general fund and defines the money and assets considered part of that fund. The CACC also clearly provides for ownership of remaining amounts in the general fund upon termination of the project: it reverts to HUD. The contract contains no provision providing for separate ownership of funds or assets upon conclusion of the project. The contract also clearly evidences the parties' intent that no third party should have any rights under the agreement.

To the extent that the County argues that the CACC provision regarding pooling of funds clearly demonstrates that the PHA had separate funds in the account, this provision is inapplicable to insurance proceeds purchased by the PHA with federal grant money and required by the terms of the CACC. See Dkt. # 39, at 5; see also Dkt. # 20-3, at 5 ("The [PHA] may also deposit into an

---

[5]  The Court notes that, even if Oklahoma law were applied, the result would be the same. Under Oklahoma law,

> [t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible[.] The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others. The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

Cyanostar Energy, Inc. v. Chesapeake Exploration, L.L.C., 317 P.3d 217, 220 (Ok. Civ. App. 2014) (internal quotation marks and citations omitted). And the parol evidence rule under Oklahoma law similarly bars extrinsic evidence when a contract is unambiguous. Rush v. Champlin Refining Co., 321 P.2d 697, 701 (Okla. 1958) ("Unless the instrument is ambiguous, it is the duty of the court to interpret it and parol evidence is not competent to explain it or vary its terms.").

11

account covered by the terms of the General Depository Agreement, by lump sum transfers of funds from the depositories of other projects or enterprises of the [PHA] in which HUD has no financial interest, amounts necessary for current expenditures of items chargeable to all projects and enterprises of the [PHA]."). The insurance proceeds do not arise out of some "other project or enterprise[]" of the PHA in which HUD held no interest; the insurance proceeds arose directly out of an insurance policy that the contractual agreement between the PHA and HUD required for their joint venture in the project. And, as stated above, the CACC clearly identifies the owner of any assets remaining in the general fund upon the conclusion of the project: HUD. Further, even if the PHA had an independent claim to any of the funds remaining in the general fund, the CACC unambiguously prohibits the creation of any right to any of the funds in a third-party, i.e. the County.

Although the dissolution of the City of Picher following the contamination, deterioration, and destruction of city land after years of zinc and lead mining and a destructive EF4 tornado may well be "a unique, unprecedented situation," the dispute regarding ownership of funds collected pursuant to a contractual relationship between the PHA and HUD is anything but. The CACC governed the relationship between the PHA and HUD, and clearly provided for disposition of assets remaining in the fund upon termination of the project. Pursuant to this provision, HUD has the right to any remaining funds or assets in the general fund.

**B.**

As stated above, the Court concludes that the contract gives HUD the right to the interpled funds; however, the Court will consider the alternative argument regarding the County's ability to collect as a successor in interest to the PHA. The County argues that, even though it was not a party to the contract, it still has a claim to funds collected pursuant to the contract because it is the

successor in interest to the now-dissolved City of Picher, which includes the PHA. Dkt. # 39, at 8. The United States argues that the County cannot be a successor in interest to the project because the project no longer exists. Dkt. # 20, at 8. The key distinction in this dispute is between the now-dissolved City of Picher and the now-discontinued project operated by the PHA. The County argues that because municipal property reverts back to the county in which it is located upon unincorporation or dissolution, it is the successor in interest to the City of Picher, and thus the PHA. Dkt. # 39, at 8 (citing M. Anderson, Dissolving Cities, 121 Yale. L.J. 1365, 1368 (2012)). The County argues that this gives it a claim to the interpled funds. But such a rule regarding dissolution of municipal entities has no bearing on the operation of the project and the contract between HUD and the PHA. The project was governed by a contract between the PHA and HUD was terminated before HUD approved the transfer of a portion of the project property to the County and before the County took title to any of the property. The County can have no claim to rights under the contract, and its argument that it is a successor in interest to the City of Picher does not vest the County with any rights to the contract, to which it remains a stranger. As such, the County cannot recover the funds as the successor in interest to the City of Picher.

## C.

The County asserts two final arguments in response to the United States's assertion that it is entitled to summary judgment: that the United States, through its own inaction, waived any right to the interpled funds and that the County has an equitable claim for at least part of the interpled funds based on the value of services it performed for the project between 2008 and 2013. Dkt. # 39, at 9-10. The United States asserts that neither argument provides a basis upon which the County can be granted any portion of the interpled funds, asserting that it did not waive its rights through

13

inaction, and that the County cannot have an equitable claim for funds based on tasks it performed as part of its normal duties. Dkt. # 40, at 6-7.

With respect to the County's claim that the United States waived its right to any interpled funds, the County argues that the insurance proceeds were paid out over seven years ago and have been transferred between various financial institutions, all of which occurred without HUD authorization or involvement. Dkt. # 39, at 9. The County also argues that there is no evidence that HUD made any type of claim to the insurance proceeds even after the dissolution of the City of Picher. Id. The United States responds that HUD was not required to present a claim to the PHA when the insurance proceeds were deposited into the general account controlled by HUD. Dkt. # 40, at 6. HUD did not waive its right to the interpled funds by not making a claim to insurance proceeds, because the contract clearly vested HUD with the right to any funds remaining in the general fund upon termination of the project. Because HUD has title to these funds pursuant to the terms of the CACC, it did not need to make a separate claim to preserve its rights. That the PHA pursued the insurance claims and deposited the proceeds in the general account is sufficient to vest ownership in HUD, without requiring HUD to take any further affirmative action.

Finally, with respect to the County's claim that it has an equitable right to some of the interpled funds, the County argues that it has an equitable claim to at least some of the funds based on valuable contributions that it made to the project over the course of several years. Dkt. # 39, at 10. The County estimates the value of the services it rendered to the project between 2008 and 2013 at $139,912. Id. The United States responds that the County has no claim for equitable relief, arguing that the County fails to specify the nature of the services it allegedly performed and

asserting that it provided services to the project that it also provided to all other residents of the county, doing nothing more for the project than any other resident. Dkt. # 40, at 8.

Although "an action of interpleader is equitable in nature and is controlled by equitable principles," the County's argument does not persuade the Court that it is entitled to equitable relief. See Burchfield v. Bevans, 242 F.2d 239 (10th Cir. 1957). That the County provided valuable services to the project has no bearing on the right to funds arising out of a contractual relationship, to which the County is a stranger. And, as the United States notes, many of the County's services were performed as duties of the County; the County was bound to perform these tasks as the County in which the project was located. But, regardless of whether the County provided the services as part of its normal duties, the fact remains that the County is a stranger to the contract which controls the funds at issue. Even if the County had a claim for compensation for the services it provided, it does not have a claim for the interpled funds stemming from the contractual relationship between the PHA and HUD, and which the Court has determined belong to HUD. The Court cannot conclude that this is an instance in which equity requires that the County receive any of the interpled funds.

**IV.**

In sum, the Court concludes that the United States is entitled to summary judgment. The interpled funds are from an account that arises out of and is governed by a contractual relationship between the HUD and the PHA. The contract expressly provides for the disposition of any remaining assets upon the completion or termination of the project, vesting HUD with the right to such funds. The County cannot recover the interpled funds as the alleged successor in interest to the City of Picher, because the City of Picher is distinct from the contractual relationship governing

the project between the PHA and HUD.  Finally, HUD did not waive its right to the interpled funds by relying upon the PHA to make claims for the insurance proceeds and the County has no equitable claim to any portion of the funds.  The Court thus concludes that the United States is entitled to summary judgment and to the full amount of the interpled funds.

**IT IS THEREFORE ORDERED** that the United States motion for summary judgment (Dkt. # 20) is **granted**.  A separate judgment will be entered directing the Court Clerk to distribute the interpled funds to the United States of America on behalf of the Secretary of the Department of Housing and Urban Development.

**DATED** this 10th day of August, 2016.

*/s/ Claire V. Eagan*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE